UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-24565-CIV-ROSENBAUM/SELTZER

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

    Plaintiff,

vs.

VERONICA BALDASSINI, *et al*.,

    Defendants.
_____/

**ORDER**

    This matter is before the Court on Plaintiff's Motion for Final Summary Judgment [D.E. 53] and Defendants/Counterclaimants' Motion for Summary Judgment [D.E. 65]. The Court has carefully considered the parties' motions, all supporting and opposing filings, and the entire record. For the following reasons, the Court now grants Plaintiff State Farm's Motion for Summary Judgment.

*I. Material Facts*[1]

    Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm") is a mutual interest insurance company organized and incorporated under the laws of the state of Illinois, with its principal place of business in the state of Illinois. *See* D.E. 1 at ¶ 3. In this matter, State Farm

---

[1] The Court has set forth the material facts based on its review of Defendant's Statement of Material Facts [D.E. 66], Plaintiff's Response to that Statement [D.E. 73], and the declarations and depositions of the parties' witnesses. In accordance with Local Rule 7.5(d), all material facts set forth in Defendant's Statement and supported by evidence of record are deemed admitted unless controverted by Plaintiff's Response.

-1-

seeks a declaratory judgement action against Defendants Santiago Fiallo ("Fiallo") and Veronica, Gabriel and Sol Baldassini (the "Baldassinis"). *See* D.E. 1, D.E. 15. Specifically, Plaintiffs ask this Court to find that the Baldassinis' auto insurance policy does not provide coverage to Defendants for the accident at issue. *Id.* This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are diverse, and the matter in controversy exceeds $75,000 exclusive of interest, costs and attorney's fees.[2] *Id.*

This dispute arises from an accident that occurred on July 22, 2010, when Defendant Sol Baldassini was operating a 2009 E-Z-Go ST Express ("ST Express") and accidentally struck Fiallo. D.E. 15 at 2. At all times relevant to this case, the Badassinis' neighbors, Alejandra Fernandez and Michalis Starvinides (collectively, "Owners"), owned the ST Express and left it in the care of the Baldassinis in Key Biscayne, Florida. D.E. 1 at ¶¶ 7,8; D.E. 66 at ¶ 4. At the time of the accident, State Farm had in effect (1) an automobile insurance policy issued to the Baldassinis, policy number 366 0234-E20-59F (the "Baldassini Policy"), and a separate recreational vehicle policy issued to the Owners (the "Owners' policy"). D.E. 1-6 at 1.

Sol Baldassini, as the daughter of the named insureds and resident of their home on July 22, 2010, was an additional insured under the Policy. D.E. 1 at 2. The Policy provided automobile liability insurance benefits according to the terms of the policy and Florida law, with bodily injury liability limits of $100,000 per person and $300,000 per accident. *Id.;* D.E. 1-6 at 1. After the accident, the Baldassinis submitted claim number 59-A598-896 to State Farm. D.E. 73 at ¶¶ 14 ,17; D.E. 66 at ¶14. State Farm responded to the claim with a Reservation of Rights letter dated August

---

[2]Venue is also proper in the Southern District of Florida. State Farm is licensed to do business in the Southern District, the insurance Policy was issued and delivered in the Southern District and all material events occurred in the Southern District. D.E. 15 at 5.

3, 2010, stating that, "it is questionable whether the vehicle in the accident constitutes either a temporary substitute, newly-acquired or a non-owned automobile or car, as defined in the policy." *See* D.E. 66-1 at 5.  Subsequently, on September 22, 2009, State Farm denied the claim, stating, "The golf cart involved in this loss does not qualify as a car under the [Baldassini Policy]."  D.E. 66-1 at 8.

Separately, the Owners also submitted a claim to State Farm under their Recreational Vehicle Policy, State Farm Policy number 792-6337-A17-59 ("Owners' Policy") [D.E. 66 at ¶ 19], which was settled on July 15, 2011.  D.E. 73 at ¶ 17; *see also* D.E. 56-1.  Under the settlement, State Farm paid Fiallo the $100,000 policy limit under the Owners' Policy.  D.E. 66 at ¶¶ 20, 21.  Following the settlement among State Farm, the Owners, and Fiallo, the Baldassinis and Fiallo agreed to a separate settlement for $495,000, and the Baldassinis assigned their rights against State Farm to Fiallo.  D.E. 66 at ¶¶ 18-24; D.E. 73 at ¶¶ 22-23.

The sole issue before this Court is whether the ST Express, commonly known as a "golf cart," qualifies as a "car" under the subject Policy to provide coverage for the Baldassinis' claim. D.E. 72 at 1, D.E. 65 at 2.  The Baldassini Policy provides liability coverage for an insured in the use of a "newly acquired car, a temporary substitute car, or a non-owned car."  D.E.1-6 at 9; D.E. 66 at ¶ 12.  Under the Baldasssini Policy, a "car" is defined as follows:  "Car - means a land motor vehicle with four or more wheels, which is designed for use mainly on public roads.  It does not include: 1. any vehicle while located for use as a dwelling or other premises; or 2. a truck-tractor designed to pull a trailer or semitrailer."  D.E. 1-6 at 3.

The ST Express is manufactured by E-Z-Go, a Textron company.  *See* D.E. 65-4; D.E. 68-1 at 27:1- 27:10.  Some of the significant features of the vehicle include a rear-view mirror, safety belts

and headlights. *See* D.E. 68-1 at 25:1-25:21. The ST Express in this matter was issued a permit by the Village of Key Biscayne ("Key Biscayne") that allows for "the use of Golf Carts within the Designated Streets of the Village." D.E. 65-1 at 3.

### *II. Procedural History*

On December 20, 2011, State Farm filed this Complaint for Declaratory Judgment under the Declaratory Judgment Act, 28 U.S.C. §2201. D.E. 1. Based on its position that the Baldassini Policy does not provide coverage for any claims arising out of the July 22, 2010, accident because the subject vehicle, the ST Express, was not a "car," as defined by the Baldassini Policy, State Farm now seeks summary judgment. *See* D.E. 53. Defendants, who counterclaimed for breach of contract and a declaratory judgment stating that the Baldassini Policy covers Defendants for the July 22, 2010, accident, have filed a dueling Motion for Summary Judgment. *See* D.E. 65.

### *III.  Analysis*

**A.  Summary Judgment Standard**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Not any factual dispute will defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48). A fact is material if "it would affect the outcome of the suit under the governing law ." *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable

to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (per curiam) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

 **B.  Applicable Law on Insurance Policy Interpretation**

Since the parties premise jurisdiction in this case on diversity grounds, this Court must determine the law applicable to this matter by looking to Florida's choice-of-law rules. *Adolfo House Distributing Corp. v. Travelers Property and Casualty Ins. Co.*, 165 F. Supp. 2d 1332, 1335 (S.D. Fla. 2001) (citing *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997); *Bituminous Casualty Corp. v. Advanced Adhesive Technology, Inc.*, 73 F.3d 335, 337 (11th Cir. 1996)). As Florida law pertains to choice of law in the context of contract interpretation, the Florida Supreme Court has "long adhered" to the rule of *lex loci contractus*. *State Farm Mut. Auto.*

*Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006). That rule provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties. *Id.* (citing *Sturiano v. Brooks*, 523 So. 2d 1126, 1129 (Fla. 1988)). In a case involving an insurance policy, the place where the contract was executed is "generally considered to be the place where the policy is delivered." *Adolfo House*, 165 F. Supp. 2d at 1335 (citing *Sturiano v. Brooks*, 523 So. 2d 1126 and *Bloch v. Berkshire Ins. Co.*, 585 So. 2d 1137 (Fla. 3d DCA 1991)).

Here, the general liability policies in controversy were issued to Florida policy holders, and the accident that gave rise to this dispute occurred in Florida. *See* D.E. 65 at 1; D.E. 53 at 2; D.E.1-6 at 1. Further, the Baldassini Policy was issued and delivered in Florida. D.E. 15 at ¶3. Moreover, all parties suggest that Florida law governs interpretation of the Baldassini Policy. *See, e.g.,* D.E. 65 at 3 ("The Court should apply Florida contract and insurance law to interpret the policy issued . . . ); D.E. 53 at 6-7 ("Florida substantive law is applicable . . ."). Thus, this Court looks to Florida law to interpret the Policy at issue. In Florida, "[w]here the duty of an insurer rests upon the legal effect of the provisions of an insurance policy, the interpretation of the policy is a matter of law for the Court to determine, and is therefore amenable to summary judgment." *Great Am. Fid. Ins. Co. v. JWR Constr. Servs., Inc.*, No. 10-61423-CIV, 2012 WL 1193848 (S.D. Fla. Apr. 9, 2012). Here, the sole issue presented to the Court is whether the ST Express qualifies as a "car" as defined by the Policy. D.E. 65 at 2; D.E. 72 at 1.

"Under Florida law, insurance contracts are construed according to their plain meaning." *Garcia v. Fed. Ins. Co.*, 969 So.2d 288, 291-292 (Fla. 2007) (quoting *Taurus Holdings, Inc. v. U.S. Fid. and Guar. Co.*, 913 So. 2d 528 (Fla. 2005)) (internal quotation marks omitted). The plain and unambiguous meanings are interpreted as they would be understood by the "man-on-the-street."

*Harrington v. Citizen Property Ins. Corp.*, 54 So. 3d 999, 1001-1002 (Fla. 4th DCA 2010) (quoting *State Farm Fire and Cas. Co. v. Castillo*, 829 So. 2d 242, 245 (Fla. 3d DCA 2002))(internal quotations omitted). "[A]mbiguities[,] [on the other hand,] are interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy." *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So. 2d 176, 179 (Fla. 4th DCA1997) (citing *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467 (Fla. 1993)). But,"[i]f the language employed in the policy is clear and unambiguous, there is no occasion for construction or the exercise of a choice of interpretations. In the absence of ambiguity . . . it is the function of the court to give effect to and enforce the contract as it is written." *Id.* (quoting *U.S. Fire Ins. Co. v. Morejon*, 228 So. 2d 223, 225 (Fla. 3d DCA 1976).

Whether a provision is ambiguous is determined by the language of the policy and not the subjective intent of the parties. *See Harrington*, 54 So. 3d at1001-1002. An ambiguity arises when more than one interpretation can fairly be given to a policy provision. *State Farm Fire & Cas. Co., v. Metro. Dade Cnty.*, 639 So. 2d 63, 65 (Fla. 3d DCA 1994). But a provision is not ambiguous simply because it is requires analysis or because it is complex. *Garcia*, 969 So. 2d at 291(citing *Swire Pac Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003)). As the *Garcia* Court explained,

> When interpreting insurance contracts, we may consult references commonly relied upon to supply the accepted meanings of words. *See Gov't Employees Ins. Co. v. Novak,* 453 So. 2d 1116, 1118 (Fla.1984) (citing *Webster's Third New International Dictionary* 11 (1966) to define "accident"); *Beans v. Chohonis,* 740 So. 2d 65, 67 (Fla. 3d DCA 1999) ("One looks to the dictionary for the plain and ordinary meaning of words.").

*Garcia*, 969 So. 2d at 292. In addition, courts derive an understanding of the terms of an insurance

policy by looking the policy as a whole.  *Garcia*, 929 So. 2d at 291; *see also Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000).  Indeed, it is important for a court to ". . . read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) (citation omitted). With these concepts in mind, the Court now considers the particular policy language at issue.

**C.  Does the ST Express fall within the meaning of a "car" as defined by the Baldassini Policy?**

As noted previously, under the Baldassini Policy, a "car" is defined as "a land motor vehicle with four or more wheels, which is designed for use mainly on public roads**.** It does not include: 1. any vehicle while located for use as a dwelling or other premises; or 2. a truck-tractor designed to pull a trailer or semitrailer." D.E. 1-6 at 3.  By the unambiguous terms of this definition, the golf cart at issue is not covered.

This definition makes the operative intent that of the "car's" designing manufacturer.  As phrased, the qualifying clause of the definition — that is, "which is designed for use mainly on public roads" — is in the passive voice, so it does not expressly specify an actor.  But obviously the actor is the designing manufacturer of the "car."  As relevant in this context, "design" means "[t]o create or contrive for a particular purpose or effect . . . ; [t]o have as a goal or purpose; intend . . . ." *The American Heritage Dictionary of the English Language* 491-92 (4th ed. 2000).  *See Garcia*, 969 So. 2d at 292 (stating that "when interpreting insurance contracts, we may consult references commonly relied upon to supply the accepted meaning of word" and looking to *Merriam Webster's Collegiate Dictionary* to find the plain and ordinary meanings of words).  Only the designing manufacturer can determine the uses for which it intends a particular vehicle. *Cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 500-01 (1982) (holding that the phrase

-8-

"designed or marketed for use" in an ordinance referred to the design of the manufacturer); *see also United States v. Biro*, 143 F.3d 1421, 1427-28 (11th Cir. 1998) (denying vagueness challenge to statute that required an export license for the export of certain devices "primarily useful for surreptitious interception of wire or oral communications" because "an ordinary person" would know that statute referred to the intent of the manufacturer, not the user).

Defendants nonetheless argue that the phrase "designed for use" can refer to the user's intent. In support of this contention, Defendants cite *State v. Bennett*, 565 So. 2d 803 (Fla. 2d DCA 1990). In *Bennett*, the court considered residential burglary charges against a defendant who had stolen property from an unoccupied mobile home located on a sales lot, under a statute defining an applicable "dwelling" as "a building or conveyance of any kind, either temporary or permanent, mobile, or immobile, which has a roof over it and is designed to be occupied by people lodging therein at night . . . ." *Id.* at 805 (quoting Fla. Stat. § 810.011(2)). Although the court concluded that such a property could be covered by the statute, it "stop[ped] short . . . of holding that the . . . statute justifies [a charge of residential burglary] any time someone enters a structure that theoretically could serve as housing." *Id.* As the court explained,

> A prefabricated "mobile home," while certainly capable of serving as someone's residence, can also be converted to any number of other uses, such as office space. When still on a sales lot, it may not always be possible to determine beforehand exactly what use a purchaser will make of such a structure. Therefore, in order to establish that the structure is a "dwelling" within the purview of the burglary statute, we believe the state must introduce some evidence that it is actually to be used for habitation.

*Id.* Thus, it is clear that the court found user intent relevant only for the purposes of narrowing — not broadening, as Defendants suggest here — application of the statute at issue since it involved

-9-

criminal liability.  Because of the peculiar context in which *Bennett* arose, the Court does not find it instructive on the meaning of "designed" at issue here.

Thus, to ascertain whether E-Z-Go "designed [the subject golf car] for use mainly on public roads," the Court looks to E-Z-Go's design intentions and discerns those intentions from the evidence submitted in this case.  Here, both parties initially direct the Court to the manual for E-Z-Go vehicles ("Manual").  In relevant part, it provides,

> These vehicles are designed and manufactured for off-road use.  They do not conform to Federal Motor Vehicle Safety Standards and are not equipped for operation on public streets.  Some communities may permit these vehicles to be operated on their streets on a limited basis and in accordance with local ordinances.

D.E. 65-4 at vi.  These statements leave no doubt that E-Z-Go did not design the golf car at issue "for use mainly on public roads."  Nor, as Defendants suggest, does the final sentence in this excerpt suggest otherwise.  That E-Z-Go recognizes that, despite the stated intended use of its products, some communities may choose to allow these vehicles "to be operated on their streets on a limited basis and in accordance with local ordinances" does not change the fact that E-Z-Go did not design them "for use mainly on public roads."  Even this acknowledgment in the Manual refers to use on a "limited," not main, basis.

In addition, the "CAUTION" statement at the beginning of the Manual explicitly acknowledges that E-Z-Go vehicles, as manufactured, are not governed by Federal Motor Vehicle Safety Standard 571.500, which pertains to "low-speed vehicles" ("LSV's"), or vehicles that operate at or in excess of twenty miles per hour, and advises that E-Z-Go "will NOT approve Distributor, Dealer or customer modifications converting E-Z-GO products into LSV's."  D.E. 65-4 at v (emphasis in original).  Safety Standard 571.500, however, applies to "all motor vehicles," 49 C.F.R.

§ 571.7, which federal law, in turn, defines as "vehicle[s] driven or drawn by mechanical power and manufactured primarily for use on public streets, roads, and highways . . . ." 49 U.S.C. § 30102(a)(6). This express refusal on the part of E-Z-Go to approve any attempt to subject its products to federal motor vehicle safety regulations applying to "vehicle[s] driven or drawn by mechanical power and manufactured primarily for use on public streets, roads, and highways . . ." further demonstrates E-Z-Go's intent that its products not be used "mainly on public roads."

Defendants fight these natural conclusions, pointing to the Manual's statements regarding safe-operation practices. More specifically, Defendants suggest that the Manual's statement that a driver should "[y]ield the right of way to pedestrians, ambulances, fire trucks, or other carriers or vehicles in emergency situations" somehow renders the ST Express a "car" under the Baldassini Policy. Two problems with this contention exist. First, nothing precludes pedestrians, ambulances, fire trucks, and other carriers and vehicles in emergency situations from traveling on non-public roads or even off road, where an ST Express would be operating if following the stated intentions of the Manual. Second, even if this portion of the Manual may generously be construed to recognize that E-Z-Go vehicles may, on occasion, be used on public roads, it does not reveal an intent on the part of E-Z-Go that such vehicles be used "mainly on public roads."

Contrary to Defendants' contention, the fact that the golf cart in question was permitted for use on Key Biscayne does not alter the analysis. Rather, it simply provides an illustration of E-Z-Go's recognition in its Manual that some communities may permit E-Z-Go vehicles "to be operated on their streets on a limited basis and in accordance with local ordinances." Key Biscayne's allowed uses of golf carts that do not comply with federal low-speed vehicle standards sheds no light on E-Z-Go's intentions when it designed the ST Express. And even if it did — which, clearly, it does not

-11-

— a review of Key Biscayne's golf cart ordinance reveals that it covers motor vehicles "designed and manufactured *for operation on a golf course* for sporting or recreational purposes . . . ." D.E. 65-1 at 3[3] (emphasis added). In other words, the ordinance implicitly recognizes that the vehicles to which it pertains were not designed and manufactured for operation mainly on public roads.

This Court's conclusions that the Baldassini Policy does not cover the subject golf cart are bolstered by a similar case in the Middle District of Florida, *Bailey v. Netherlands Insurance Co.*, 615 F. Supp. 2d 1332, 1332 (M.D. Fla. 2009). In *Bailey*, the court considered whether a golf cart involved in an accident was a covered "auto" within the meaning of the owner's automobile liability policy. *Id.* The insurance policy there defined an "auto" as "a land motor vehicle, 'trailer' or semitrailer designed for travel on public roads but does not include 'mobile equipment.'" *Id.* at 1335. Ultimately, the court held that the golf cart was not a covered "auto" because it was not designed to be operated on public roads. *Id.* The court arrived at this conclusion by taking into consideration the objective features of the golf cart and evidence that the golf cart was not intended for use on public roads.[4] *Id.* This Court finds no basis for reaching a different conclusion here, where it appears that the Baldassini Policy language effectively adopted the *Bailey* Court's definition of an "auto."

Defendants' argument that other parts of the Baldassini Policy require a different outcome

---

[3]Where docket entries contain more than one page-numbering system, this Order refers to the page numbers imprinted at the tops of the pages by the Court's CM/ECF electronic filing system.

[4]Although the *Bailey* Court applied North Carolina law, because no North Carolina cases were on point, the court supported its analysis with a Florida case and looked primarily to the record and the plain language of the policy — just as it would have been required to do under Florida law.

are likewise unavailing. In this regard, Defendants assert that State Farm's failure to explicitly exclude golf carts from the definition of "car" leaves open the possibility that golf carts are "cars." But Defendants' suggested reading of the language ignores entirely the phrase "which is designed for use mainly on public roads" and instead would apply coverage to all motor vehicles of every conceivable type, with at least four wheels, that are not specifically identified as being excluded from coverage. The Court is not free to disregard language in a contract where that language is susceptible to a reasonable interpretation. *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979).

Defendants likewise point to the fact that the Baldassini Policy includes a separate definition for "private passenger car" and suggest that if State Farm wished to limit coverage under the Policy to traditional passenger cars that are designed to travel on highways, the "private passenger car" definition would be redundant. But the definition of "private passenger car" encompasses a smaller universe of vehicles than the definition of "car." The Baldassini Policy defines "private passenger car" as follows:

> Private Passenger Car — means a car:
>
> 1. with four wheels;
> 2. of the private passenger or station wagon type; and
> 3. designed solely to carry persons and their luggage.

D.E. 1-6 at 6. Thus, a "private passenger car" would not include a recreational vehicle, for example, whereas a "car" would, as long as the recreational vehicle was being driven at the time. Because the two definitions are not mutually inclusive, construing "car" to exclude golf carts does not render meaningless the "private passenger car" provision.

-13-

Finally, Defendants argue that under Florida law, certain golf carts are designed for use on public roads. In support, they cite a Florida Fourth District Court of Appeal case, *Herring v. Horace Mann Ins. Co.*, 795 So. 2d 209, 211 (Fla. 4th DCA 2001). In *Herring*, the court considered whether the terms of a homeowner's insurance policy provided coverage for a claim arising out of an accident involving a golf cart owned by a third party. There, the insured party claimed that it was entitled to coverage because a golf cart qualifies as a recreational motor vehicle under the policy, which read,

> We pay for the bodily injury or the property damage which: . . . b. results from: 1) a golf cart while used for golfing; 2) a utility, boat, camp or mobile home trailer, . . . or a recreational motor vehicle; or 3) a motorized vehicle which is designed only for use of public roads and which is used mainly to service the insured premises;

*Id.* at 210.

As in this case, the insured in *Herring* also asserted that golf carts are motor vehicles because they may be used on public roads and because they are capable of being licensed for use on public highways. *Id.* at 211. The court acknowledged that "golf carts, as such, are not generally designed for use on public roads . . . . [A] golf cart, patently, is designed for operation at low speed on a golf course or for similar sporting or recreational purposes, or for transportation on private property." *Id.* Nevertheless, it held that the insured was covered because it found the policy ambiguous. Crucial to reaching this conclusion was the court's determination that it was "not clear whether a golf cart qualifies as a recreational motor vehicle under the terms of [the *Herring*] policy." *Id.* The instant case, however, includes no such similar recreational vehicle provision.[5] As a result, the policy construed here is not analogous to the one at issue in *Herring*.

---

[5] State Farm does, however, issue a recreational-vehicle policy. In fact, State Farm paid the policy limits to the Owners under that policy. D.E. 73 at ¶ 17; *see also* D.E. 56-1.

### *IV.  Conclusion*

For the foregoing reasons, Plaintiff State Farm's Motion for Summary Judgment [D.E. 53] is **GRANTED**, and Defendants/Counterclaimants' Motion for Summary Judgment [D.E. 65] is **DENIED**.  Pursuant to Rule 58, Fed. R. Civ. P., the Court will enter a separate judgment for Plaintiff.

**DONE** and **ORDERED** at Fort Lauderdale, Florida, this 17th day of December 2012.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE


copies:      The Honorable Barry S. Seltzer
             Counsel of Record